540 P.2d 727

STATE of Arizona, Ernest A. Garfield, State Treasurer of Arizona, State Tax Commission of Arizona and Waldo DeWitt, John Hazelett and Robert Kennedy, Members of and Constituting State Tax Commission of Arizona, Apache County, LaVere O. Connolly, Treasurer of Apache County, Cochise County, F. C. Alexander, Treasurer of Cochise County, Coconino County, Rose Stacy, Treasurer of Coconino County, Gila County, Roy Wood, Treasurer of Gila County, Graham County, Lola Hubbard, Treasurer of Graham County, Maricopa County, Harold D. Lafferty, Treasurer of Maricopa County, Mohave County, Ruth O. Moser, Treasurer of Mohave County, Navajo County, Raymond H. Randall, Treasurer of Navajo County, Pima County, James Lee Kirk, Treasurer of Pima County, Pinal County, Alice M. Diffin, Treasurer of Pinal County, Yavapai County, Paul J. Wedepohl, Treasurer of Yavapai County, Yuma County, Robert E. Lee, Treasurer of Yuma County, Appellants,

v.

ARIZONA PUBLIC SERVICE COMPANY, a corporation, Appellee.

No. I CA–CIV 2354.

Court of Appeals of Arizona, Division 1, Department B.

Oct. 2, 1975.

Rehearing Denied Nov. 7, 1975.
Review Denied Dec. 16, 1975.

Bruce E. Babbitt, Atty. Gen. by James D. Winter and Fred W. Stork, Asst. Attys. Gen., Phoenix, for appellants.

Snell & Wilmer by Burr Sutter, Phoenix, for appellee.

## OPINION

JACOBSON, Presiding Judge.

The basic issue in this appeal is whether a taxpayer may recover a portion of its tax bill for taxes paid under protest against an alleged unconstitutional legislative appropriation which it is alleged contributed to an increase in those taxes.

Appellee, Arizona Public Service (APS), brought an action against the appellants, State of Arizona, the State Treasurer and the Tax Commission seeking a refund of $1,789,894.31 in property taxes for the year 1970 paid under protest. On cross-motions for summary judgment, the trial court granted APS all the relief requested and this appeal followed.

The facts are not in dispute. In 1970, the Arizona Legislature passed a general appropriation bill (Chapter 162, Session Laws 1970). Included within this general appropriation bill were two items classified as the "Capital Outlay Stabilization Fund", to which an appropriation of $12,000,000.00 was made and the "Operating Reserve" to which an appropriation of $20,000,000.00 was made. These items were included within a total of $397,056,822.00 deemed necessary by the State to carry on the State's business for the fiscal year 1970.

In 1970, the State Tax Commission calculated the State tax rate necessary to raise these revenues as follows:

| | | |
|---|---|---|
| Appropriations: | | $397,056,822.00 |
| Sources of Revenue: | | |
| Estimated receipts | $305,045,831.00 | |
| Surplus | 44,292,166.00 | |
| Total | | 349,337,997.00 |
| Amount to be raised by property tax | | $ 47,718,325.00 |

Net assessed valuation = $2,890,568,666.00
$47,718,825.00 ÷ $2,890,568,666.00 = $.0165 = $1.65 tax rate per $100 assessed valuation

In paying its tax bills for the year 1970, APS contended that the appropriations of $32,000,000.00 to the "Capital Outlay Stabilization Fund" and the "Operating Reserve" were unconstitutional appropriations and if these items were removed from the calculations of the state tax rate, the proper rate would be $.54 per $100 assessed valuation. It therefore paid under protest all its taxes to the various 14 county treasurers for those amounts exceeding a billing based upon a 54¢ tax rate.

APS subsequently brought suit pursuant to A.R.S. § 42–204 (1956) to recover those taxes paid under protest.

The State's basic contention is that APS's complaint failed to state a claim for relief and thus should be dismissed. Specifically, the State contends the failure of APS to allege that the tax levy set by the State Tax Commission was so "grossly excessive as to be arbitrary or fraudulent" defeats its action. To adequately understand the State's argument in this regard, it is necessary to set forth the background underlying the legislature's creation of the "Capital Outlay Stabilization Fund" and the "Operating Reserve" accounts.

In 1970 and prior thereto, the State Tax Commission had the authority to estimate the amount of revenue to be received by

the State from sources other than direct property taxation. A.R.S. § 42–108.01(A), (Supp.1974) Added Laws 1967, ch. 107 § 1, amended Laws 1974, ch. 150, § 5. These sources included "income tax", "sales tax", "gasoline tax", and so forth. As set forth in the above computation, these estimated revenues, together with any surplus, subtracted from the appropriation form the basis of the direct property tax rate. It was apparently the practice of the State Tax Commission for several years prior to 1970 to deliberately underestimate the amount of these expected revenues, in order to insure that fluctuating economic conditions which would directly affect the amount of sales tax, gasoline tax and income tax collected, did not result in the State being unable to meet its financial obligations. In the year 1970, the legislature concluded that a more sound fiscal policy would ensue if the State Tax Commission would estimate the anticipated revenues of the State accurately and to the best of its ability. In order to insure the fiscal soundness of the State's finances and hedge against unexpected economic downturns the legislature included within its appropriation bill "reserves" (the capital outlay stabilization fund and the operating reserve accounts).

For the year 1970, according to the affidavits presented, the State Tax Commission followed the legislature's directive and estimated the anticipated state revenues from sources other than the direct property tax to the best of its ability which, together with the "reserve" reflected in the legislative appropriations bill, resulted in a surplus for the year 1970–1971 of $31,031,920.00. This surplus compares with a surplus of $29,844,637.00 in 1968–69 and $44,147,683.00 in 1969–70.

Based upon these comparative surplus figures, the State contends that the court need not reach the issue of constitutionality of the particular appropriation in-

volved because of two arguments: (1) The tax rate set by the Commission upon which APS paid its taxes under protest is not excessive compared to previous years and thus APS's complaint for refund must be dismissed; and (2) APS has not suffered a loss since the surplus generated for the year 1970–71 was carried over to the following year resulting in a lowering of the tax rate for that year from which APS benefited and therefore to allow APS to recover taxes for the year 1970 would result in a double recovery to APS.

The State's first argument is predicated upon the holding in *Cochise County v. Southern Pacific Co.,* 99 Ariz. 385, 409 P. 2d 549 (1966). In this second *Cochise County v. Southern Pacific Co.* case,[1] the facts were that the State Board of Equalization, which at that time set the state property tax rate, was advised by the State Superintendent of Public Instruction that the sum of $10,115,170.00 was needed for high school education. This figure was based upon a computation using "average daily enrollment" figures for high school students. In fact, this figure was incorrect. The correct figure should have been based upon a computation using "average daily attendance" figures for high school students. The result was that the incorrect figure actually increased the taxes of the taxpayer in the amount of $24,902.92.

Under these facts, the Supreme Court (in a three to two decision) held in *Cochise* that:

"The board of equalization has the duty of fixing the rate of levy for state taxes as prescribed in A.R.S. § 42–141 et seq. Unless this rate was so grossly excessive as to show it was arbitrary or fraudulent . . . such a levy cannot be set aside. Although the board acted on incorrect information, there is no showing that the rate was grossly excessive, or that the action of the board was

---

1. The first *Cochise County v. Southern Pacific* case dealt with the constitutionality of discriminatory tax assessments. See *Southern*

*Pacific Co. v. Cochise County,* 92 Ariz. 395. 377 P.2d 770 (1963).

in fact arbitrary or fraudulent." 99 Ariz. at 393–94, 409 P.2d at 555.

Based upon this holding, the State in this case argues that although the State Tax Commission may have acted on incorrect figures supplied to it by the legislature (conceding for the purpose of this argument that the legislative appropriation may have included unconstitutional appropriations) unless APS can show that the tax rate actually set was so excessive as to be arbitrary or fraudulent, its action must fail. This element the State contends, APS failed to allege or prove.

APS counters this argument by contending that the second *Cochise* case is in reality a "discretionary" case rather than a "legality" case and points to the following language contained in *Maricopa County v. Southern Pacific Company,* 63 Ariz. 342, 162 P.2d 619 (1945) to support its contention that where the legality of the rate set is attacked, it need not allege or prove excessiveness amounting to fraudulent or arbitrary action:

"A levy may be excessive either because it will result in the collection of a sum more than is needed, or because it is greater in amount or rate than the limit fixed by the constitution or a statute. In the first case, the courts rarely interfere, since the amount is largely in the discretion of the levying body.

\*   \*   \*   \*   \*   \*

"As we construe the pleadings the amount of the levy, strictly speaking, is not an issue; hence the question of whether there was an abuse of discretion by the board of supervisors in fixing the budget and levy need not be determined. Plaintiff does not attack the rate of the levy, but confines its attack to the want of authority to make the levy." 63 Ariz. at 346–47, 162 P.2d at 622.

From this premise, APS argues that if it were attacking the discretionary actions of the Tax Commission in setting the rate for the year 1970, the holding in the second *Cochise* case would be applicable and it

would have to show excessiveness amounting to fraudulent or arbitrary conduct. However, it argues, it does not attack any discretionary act of the Commission but attacks the mechanical process of including within its mathematical computation illegal and unconstitutional appropriation—in essence, the legality of the base from which the Tax Commission starts.

We agree that APS's position is logically sound. However, we have a great deal of difficulty in reconciling that logical position with the majority holding in *Cochise County v. Southern Pacific, supra.* While APS attempts to cast the second *Cochise* case in a discretionary category, in reality what Southern Pacific was attacking was the illegality of the computation supplied by the Superintendent of Public Instruction, not the discretion of the Board of Equalization in setting the rate. However, the majority in the *Cochise* case held:

"[W]e have held the board of equalization, in carrying out its tax-setting power, acts judicially, and cannot be attacked in the absence of a showing that the board acted in bad faith, or so arbitrarily as to amount to constructive fraud.

\*   \*   \*   \*   \*   \*

"Examination of the facts in the instant case shows that the state board of equalization did not act arbitrarily or fraudulently, because it acted as the statute directed on the certification of the state superintendent of public instruction." 99 Ariz. at 391–93, 409 P.2d at 553–555.

We find no rational difference between acting on the illegality of figures supplied by an executive agency as was done in *Cochise* and acting on the illegality of figures supplied by the legislature. Moreover, we do not see any rational difference between illegality arising from violation of a statute as was done by the Superintendent of Public Instruction in the *Cochise* case and illegality arising from violations of the constitution as is alleged in this case. If

anything, the moral outrage is greater in completely disregarding a statute clear on its face, than in following a legislative enactment which carries with it a presumption of constitutionality.

In sum, we are unable to logically differentiate between the legal principles presented in the *Cochise* case with those presented here. This does not mean, however, that we agree with those principles. In our opinion, it is illogical to attribute discretionary functions to the State Tax Commission when dealing with its mechanical, mathematical function of setting a tax rate. Here the legislature supplied the State Tax Commission with a figure which was constitutionally proper or it was not. The Commission exercises no discretion whether to use that figure in setting up tax rates; it is statutorily mandated to do so. A.R.S. § 42–108.01 (as in effect 1970). This is a ministerial function. *State v. Airesearch Mfg. Co., Inc.,* 68 Ariz. 342, 206 P.2d 562 (1949). We would agree that if APO were alleging that the State Tax Commission had underestimated the anticipated revenues (in our opinion, a discretionary act of the commission) which resulted in a tax rate higher than was necessary to satisfy current state expenses, the rationale voiced by the majority holding in *Cochise* would logically apply and the complaining taxpayer should be required to show excessiveness in the tax rate amounting to fraudulent or arbitrary conduct. This is the holding of the cases cited by the majority in *Cochise* to support its reasoning. *See, United Globe Mines v. Gila County,* 12 Ariz. 217, 100 P. 774 (1909); *People ex rel. Thompson v. Chicago & N. W.R. Co.,* 397 Ill. 266, 73 N.E.2d 418 (1947); *State ex rel. and to Use of Johnson v. St. Louis-San Francisco Ry. Co.,* 315 Mo. 430, 286 S.W. 360 (1926), and *State ex rel. Woodward v. Peal,* 136 Kan. 136, 13 P.2d 302 (1932).

APS is not attacking this discretionary function (nor was Southern Pacific in the *Cochise* case). Rather, it is complaining that the figures supplied to it by the legislature over which it had no discretionary control contained unconstitutional items and by reason of these alleged unconstitutional appropriations the tax rate was illegally set. Excessiveness in this context is not an issue—unconstitutionality of the legislative action is. Justice, in our opinion, should mandate that the constitutionality of the tax setting function should not depend upon whether the unconstitutionality results in an excessive tax rate. To do so condones unconstitutional legislative action, so long as no taxpayer is hurt excessively.

Be that as it may, we have previously indicated we can find no logical distinction between APS's position here and Southern Pacific's position in the second *Cochise* case. It is further our opinion that that case is controlling on the issues here and not having the power to overrule Supreme Court decisions, *McKay v. Industrial Commission,* 103 Ariz. 191, 438 P.2d 757 (1968), we must follow its mandate, leaving to the Supreme Court the decision of whether it should reconsider its holding.

Pursuant to the holding in *Cochise v. Southern Pacific, supra,* we hold that APS having failed to allege and prove that the alleged unconstitutional appropriation resulted in an excessive tax rate so as to be fraudulent or arbitrary, its complaint should have been dismissed.

The judgment of the trial court is reversed and the matter remanded with directions to enter judgment in favor of the State Tax Commission.

HAIRE, C. J., and EUBANK, J., concur.